# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-70024

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2016

Lyle W. Cayce
Clerk

BILL DOUGLAS GATES,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas, Houston
USDC No. 4:09-CV-2702

Before JOLLY, CLEMENT, and HAYNES, Circuit Judges.

PER CURIAM:*

Bill Douglas Gates, convicted of capital murder and sentenced to death in Texas, requests a certificate of appealability (COA) authorizing him to appeal the district court's denial of federal habeas relief as to five ineffective assistance of trial counsel (IATC) claims. We GRANT a COA for the claim regarding investigation and presentation of mitigating evidence, and deny a COA for the remaining claims.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-70024

I.

This court's June 2012 opinion summarized the evidence presented at trial, as follows:

In the early morning of December 14, 1999, Lorenzo Smith found the body of his friend, Elfreda Gans, in the bathtub of her apartment. Her naked body bore signs of strangulation and sexual assault. When police arrived, blood and cleaning supplies were in the bathroom, and several of the bathroom surfaces appeared to have been wiped clean. A search of the rest of Gans's apartment revealed blood on her bedding and a bloody bandage on the bedroom floor.

Gates was arrested and charged with Gans's murder. While awaiting trial, Gates was incarcerated in the Harris County, Texas jail with James Jackson. At trial, Jackson testified that Gates said that he went to Gans's apartment on the night of her murder for the sole purpose of trading cocaine for sex. According to Jackson, Gates told him that after he and Gans got into an altercation, he hit Gans and choked her until her body became limp. He then tried to clean up the area before leaving. Gates also told Jackson that he later realized that he left a bandage from his injured finger at Gans's apartment.

After extensive voir dire, Gates's criminal trial began on October 23, 2000. Over the course of several days, the prosecution presented testimonial and physical evidence linking Gates to Gans's murder. For example, the prosecution presented evidence indicating that Gates's fingerprint was located on the wall that was next to the bathtub where Gans's body was found. According to the examiner who found it, the fingerprint appeared to have been made while the person was leaning against the wall and placing something in the bathtub. In addition, the state presented evidence establishing that blood stains found in Gans's bedroom contained DNA that matched Gates's DNA. On October 31, the defense rested and the case was submitted to the jury. That same day, the jury returned a guilty verdict.

Gates's sentencing hearing began on November 1, 2000. The prosecution put on several witnesses who testified about Gates's lengthy criminal history. Among the witnesses who testified was

2

No. 15-70024

Michael Camero, a fellow inmate at the Harris County Jail who stated that Gates had threatened to strangle him in his sleep. The defense, on the other hand, did not call any witnesses. The jury answered the special punishment issues in a manner requiring the imposition of a death sentence.

*Gates v. Thaler*, 476 F. App'x 336, 337–38 (5th Cir. 2012).

On direct appeal, Gates claimed that (1) he was denied his right of self-representation; (2) the verdict was contrary to the great weight of evidence; (3) trial counsel rendered ineffective assistance by failing to object to the prosecutor's comment on Gates's failure to testify; and (4) the trial court erred by admitting evidence of Gates's juvenile record at the punishment phase. In September 2002, the Texas Court of Criminal Appeals (TCCA) affirmed Gates's conviction and sentence. *Gates v. State*, No. 74,009 (Tex. Crim. App. 2002) (unpublished). Gates did not seek certiorari review.

On June 4, 2002, while his direct appeal was still pending, Gates filed a post-conviction application for state habeas relief. The application listed ten claims: (1) denial of the right of self-representation; (2) the conviction is against the great weight of the evidence; (3) ineffective assistance of counsel in failing to object to the prosecutor's comment on Gates's failure to testify; (4) deprivation of a fair sentencing proceeding as a result of the admission of Gates's juvenile record at the punishment phase; (5) prosecutorial and police suppression of favorable evidence; (6) ineffective assistance of counsel at trial; (7) ineffective assistance of counsel on appeal; (8) incompetence to stand trial; (9) denial of a fair and impartial jury selection process; and (10) actual innocence. The application contains no facts or allegations for claims 5-10, but states an intention to develop the facts and law for those claims at a later time. However, there was no such development.

3

No. 15-70024

Without conducting an evidentiary hearing, the convicting court made findings and conclusions and recommended that relief be denied. On August 20, 2008, the TCCA adopted the factual findings and legal conclusions of the convicting court and denied relief on the merits of Gates's claims. *Ex parte Gates*, 2008 WL 3856718, No. WR-69637-01 (Tex. Crim. App. 2008) (unpublished).

The district court appointed counsel to represent Gates in federal proceedings on September 10, 2008. *Gates v. Quarterman*, No. 4:08-mc-00436 (S.D. Tex.). Gates sought funds for investigative assistance in developing his federal habeas claims, including funds to retain a mitigation specialist. The court granted $7,500, the presumptive cap. It also granted a subsequent request for funds for a psychological examination.[1]

Gates filed a federal habeas petition on August 19, 2009, claiming that trial counsel rendered ineffective assistance by:

(1) failing to investigate and present readily available mitigating evidence;

(2) agreeing to excuse without oral examination every veniremember whose questionnaire indicated a categorical opposition to the death penalty;

(3–4) failing to object, on hearsay and Confrontation Clause grounds, to testimony that Gates had threatened another detainee in the Harris County jail;

(5) failing to object to testimony about Gates's resistance to arrest in 1996; and

---

[1] Gates did not request any additional funds or argue that additional factual investigation was necessary for the development of his claims until he filed his supplemental brief in the district court on July 29, 2014.

4

(6) failing to object to the prosecutor's comment on Gates's failure to testify.

The first five of those claims were raised for the first time in federal court. Gates's explanation for his failure to exhaust those claims in state court was that state habeas counsel did not raise any issues cognizable in a post-conviction writ application under Texas law. Gates moved to stay and abey further proceedings in federal court so that he could return to state court to exhaust the claims. The district court granted the motion in September 2009.

Gates filed a state habeas application in the convicting court on November 17, 2009, raising the five unexhausted IATC claims that he presented in his federal habeas petition. He relied on the evidence he had developed in federal court. He did not ask the state court to authorize additional funding, but did request an evidentiary hearing. He claimed that the application was an initial, not subsequent, application, because the application previously filed on his behalf in 2002 was not actually a habeas application under Texas law. The TCCA did not agree, however, and dismissed the application on the ground that it failed to satisfy the requirements of Article 11.071, § 5. *Ex parte Gates*, 2010 WL 179758, No. 69637-02 (Tex. Crim. App. 2010) (unpublished).

Gates's federal habeas case was reopened on June 22, 2010. On May 31, 2011, the district court denied relief and denied a COA. The court held that the first five claims were procedurally defaulted and that Gates had made no effort to show cause and prejudice, or a fundamental miscarriage of justice, that would allow him to overcome the procedural bar. It held that Gates had not shown that the state court's adjudication of the sixth claim was contrary to, or an unreasonable application of, clearly established federal law. In a footnote, the court stated that it had reviewed the allegations Gates made with

respect to the defaulted claims and dismissed them "with confidence that, if habeas procedure allowed for plenary federal review, his claims would not merit habeas relief."

On October 3, 2011, Gates filed a Rule 60(b) motion in the district court and a motion for stay of appellate proceedings in this Court, pending the Supreme Court's decision in *Martinez v. Ryan.* The following day, Gates filed a COA application in this Court. This Court denied the motion for stay on October 18, and the district court denied the Rule 60(b) motion on November 1, 2011.

On June 19, 2012, this Court denied Gates's COA application. The Court held that federal merits review was foreclosed with respect to the five claims dismissed by the state court on procedural grounds because the dismissal was adequate, independent of federal law, and was not excused by the alleged ineffectiveness of Gates's initial state habeas counsel. With respect to the sixth claim (ineffective assistance of counsel in failing to object to the prosecutor's comment on Gates's failure to testify), this Court held that reasonable jurists would not debate the district court's disposition. *Gates v. Thaler*, 476 F. App'x 336 (5th Cir. 2012).

The Supreme Court granted certiorari on June 3, 2013, vacated, and remanded to this Court for further consideration in the light of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). *Gates v. Thaler*, 133 S. Ct. 2764 (2013). This Court remanded the case to the district court for reconsideration of Gates's five procedurally defaulted IATC claims. *Gates v. Stephens*, 548 F. App'x 253 (5th Cir. 2014). Gates filed a supplemental brief in the district court on July 29, 2014, in which he argued that he needed to develop the evidence and have a federal evidentiary hearing in order to establish that his federal claims have some merit and that state habeas counsel was ineffective, as required by

No. 15-70024

*Martinez* and *Trevino*.  The State opposed Gates's request, noting that federal habeas counsel was previously given a significant amount of time and money to develop and prepare his original brief and federal habeas petition.

The district court denied Gates's requests for additional funding and an evidentiary hearing on the following grounds:

(1)  Gates relied on the record alone to discuss four of his IATC claims, and the record provides a sufficient basis to resolve those claims.

(2) The court had already authorized significant funds for Gates to develop his claims and had authorized Gates to retain an investigator, but Gates had not previously complained that the funding was insufficient.

(3) Gates provided no specificity regarding what issues lacked adequate development or how additional factual development would result in a record different from that already before the court, and did not suggest what evidence he could adduce that would explain why state habeas counsel chose to advance only the claims contained in his initial state habeas application.

(4) Gates provided "only superficial briefing" on how his new evidence would impact the jury's consideration of his sentence and made only "cursory arguments" regarding his ability to show prejudice, either as a component of the procedural bar or on the merits.

The district court denied federal habeas relief, holding that Gates's claims were procedurally barred and that Gates had not shown cause to excuse the default.  Alternatively, the district court held that the claims lacked merit because Gates had not demonstrated prejudice.  It also denied a COA.  Gates timely appealed.

7

No. 15-70024

II.

Gates requests a COA to appeal the denial of relief on his five procedurally defaulted IATC claims.  He also requests oral argument.  He claims that his trial counsel rendered ineffective assistance by:

(1) failing to investigate and present readily available mitigation evidence at the punishment phase of trial;

(2) agreeing to excuse without oral examination every veniremember who indicated on his or her questionnaire a categorical opposition to the death penalty;

(3–4) failing to object, on hearsay and Confrontation Clause grounds, to testimony that Gates had threatened another detainee in the Harris County Jail; and

(5) failing to object to testimony describing Gates's aggressive behavior in 1996, when he was arrested in his own home by police who had forcibly entered the home illegally.

Gates also argues that the district court should not have denied his claims without allowing further factual development and conducting an evidentiary hearing.

In order to obtain a COA, Gates must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  With respect to claims dismissed on procedural grounds, the petitioner must show both "[1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right

8

No. 15-70024

and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

When "reviewing [a] request for a COA, we only conduct a threshold inquiry into the merits of the claims [the petitioner] raise[s] in his underlying habeas petition." *Reed v. Stephens*, 739 F.3d 753, 764 (5th Cir. 2014) (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)). This "threshold inquiry" is not a "full consideration of the factual or legal bases adduced in support of the claims," but rather "an overview of the claims in the habeas petition and a general assessment of their merits." *Miller–El*, 537 U.S. at 336. In generally assessing the claims for relief in a COA application, "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. And "in a death penalty case, 'any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor.'" *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alteration in original) (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)).

For the reasons that follow, we DENY a COA for claims 2-5, because reasonable jurists would not debate the district court's denial of relief as to those claims. Because this is a death penalty case and we are to resolve in Gates's favor any doubts as to whether a COA should issue, we GRANT a COA for claim 1. We are convinced that the issue has been addressed fully in the briefing filed in the district court and this court. If, however, Gates wishes to file a supplemental brief with respect to the merits of the claim, he may do so within thirty days of the date of this order. The supplemental brief should address *only* matters, if any, that have not already been covered in the brief in support of the COA application. If Gates files a supplemental brief, the State may file a response fifteen days thereafter, to be similarly limited to matters

that have not already been covered in its brief in opposition to Gates's COA application. We now turn to address the four remaining claims.

### A.

The IATC claims for which Gates seeks a COA were dismissed as an abuse of the writ by the TCCA. Accordingly, these claims are procedurally defaulted, and federal review is barred unless Gates can show cause for the default and actual prejudice as a result of the alleged violation of federal law, or that the failure to consider the claims will result in a fundamental miscarriage of justice (which requires that he show he is actually innocent of the crimes for which he was convicted). *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992).

In *Martinez v. Ryan*, the Supreme Court held that a petitioner may establish cause to excuse the procedural default of an IATC claim by showing that (1) his state habeas counsel was constitutionally deficient in failing to include the claim in his first state habeas application; and (2) the underlying IATC claim is "substantial." 132 S. Ct. 1309, 1318 (2012). For a claim to be "substantial," the petitioner "must demonstrate that the claim has some merit." *Id.* An IATC claim is "insubstantial" if it "does not have any merit" or is "wholly without factual support." *Id.* at 1319.

Gates contends that the ineffective assistance of his state habeas counsel, Ken McLean, excuses any procedural default. Although McLean died soon after Gates's federal habeas counsel was appointed, Gates asserts that prior to McLean's death, McLean met with Gates's federal counsel to discuss the case. During that meeting, McLean allegedly volunteered that he had not read the trial record, had not conducted any investigation, had not met with Gates's trial counsel, had not interviewed members of Gates's family, had not made any inquiry into Gates's social, medical, or psychiatric background, and

had not obtained a psychiatric evaluation of Gates. Further, McLean allegedly conceded that he had done nothing to represent Gates other than to copy the brief on direct appeal and rename it a habeas application. According to Gates, the only difference between the direct appeal brief and the state habeas application is that the habeas application lists several allegations not raised on direct appeal, along with a statement that counsel intended to investigate and brief those allegations at a later time. However, no such investigation and brief were done. Gates contends that because non-jurisdictional matters which were, or could have been raised on direct appeal, are not cognizable in a post-conviction habeas application under Texas law, it is apparent from the record that McLean was ineffective.

Gates also asserts that his family and trial counsel can confirm that they were never contacted by McLean, and that family members can establish that letters addressed to McLean, inquiring about the status of the case and whether they could provide any helpful information, were never answered. Gates maintains that it is not reasonable under these circumstances to expect any further proof of McLean's ineffectiveness.

The State contends that Gates's primary offer of proof of the ineffective assistance of state habeas counsel—the account of an alleged conversation between his federal habeas counsel and state habeas counsel—is inadmissible hearsay, and there is no evidence of what family members and trial counsel might say. The State asserts that, in any event, state habeas counsel cannot be ineffective for not raising meritless claims.

To establish ineffective assistance of his initial state habeas counsel, Gates must show both that habeas counsel's performance—in failing to present the IATC claims in the first state habeas application—was deficient and that he was prejudiced by the deficient performance—that is, that there is a

11

reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application. *See Martinez*, 132 S. Ct. at 1318, *Strickland*, 466 U.S. at 687. The *Strickland* standard also applies to Gates's underlying IATC claims.

Under *Strickland*, "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal quotation marks and citations omitted).

With respect to the duty to investigate,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91. *See also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). The Supreme Court has stated that these three post-*Strickland* cases, each of which granted relief on ineffective assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406–07 (2011). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 131 S. Ct. 770, 789–90 (2011). Gates's trial counsel, as well as his state habeas counsel, were "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.

To demonstrate prejudice, Gates

must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792 (citation omitted). This showing is intentionally difficult to satisfy: "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome. . . . Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Richter*, 131 S. Ct. at 791–92 (citations omitted).

No. 15-70024

Even if Gates can establish that ineffective assistance of his initial state habeas counsel constitutes cause for the default of his IATC claims, "[a] finding of cause and prejudice does not entitle [him] to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S.Ct. at 1320.

The district court held that Gates had not met his burden of showing that a reasonable attorney necessarily would have raised each ground for relief in a state habeas application and had not shown a reasonable probability that he would have succeeded on state habeas review had the claims been raised. It thus concluded that Gates had not shown cause to excuse the procedural default. In the alternative, the district court addressed the merits of Gates's IATC claims and concluded that he was not entitled to federal habeas relief.

Because the district court addressed the merits of Gates's IATC claims, it is arguable that Gates has received the relief available to him under *Martinez* and *Trevino*. *See Preyor v. Stephens*, 537 F. App'x 412, 422 (5th Cir. 2013). We now turn to consider whether reasonable jurists would debate the district court's decision that Gates's IATC claims are without merit.

B.

1. Jury Selection

Gates requests a COA for his claim that trial counsel were ineffective when they agreed with the prosecutors to excuse certain prospective jurors without individual questioning, based solely upon questionnaire responses (Claim 2).

The questionnaires completed by the prospective jurors are not in the record, but Gates alleges that the questionnaires sought the following responses to two questions. Question 50 asked panel members to check the

14

one statement that best summarized their general views about capital punishment:

(1) I am opposed to capital punishment under any circumstances.

(2) I am opposed to capital punishment except in a few cases where it may be appropriate.

(3) I am neither generally opposed to or generally in favor of capital punishment.

(4) I am in favor of capital punishment except in a few cases where it may not be appropriate.

(5) I am strongly in favor of capital punishment as an appropriate penalty.

Question 51 asked prospective jurors to assume they were on a jury to determine the punishment for a defendant who had already been convicted of a very serious crime and, if the law gave them a choice of death, life imprisonment, or some other penalty, to check one of the following five statements:

(1) I cannot vote to assess the death penalty under any circumstances.

(2) I am opposed to the death penalty but could vote to assess it in a proper case.

(3) My decision on whether to assess the death penalty would depend upon the facts and circumstances of the case.

(4) I would usually vote for the death penalty in a case where the law allows me to do so.

(5) I would vote to assess the death penalty in every case where I could.

According to Gates, his trial counsel agreed to dismiss prospective jurors who checked "1" and "2" in exchange for the prosecutors' agreement to dismiss an equal number of prospective jurors who checked "4" or "5." He alleges that no panel member who checked "1" or "5" on either question was subject to

individual questioning and that all of the jurors who were selected checked "3" on question 51.  Gates argues that his counsel's agreement to dismiss anti-death penalty jurors, without forcing the prosecution to exercise peremptory challenges, is insupportable as a jury selection strategy in a system where capital defendants cannot be sentenced to death without juror unanimity.  He maintains that the alleged agreement led to the exclusion of defense-friendly prospective jurors who otherwise would have been qualified, and allowed the prosecution to better preserve peremptory strikes.  The effect of the agreement, according to Gates, was to concede the disqualification of many veniremembers whom it would have been unconstitutional to disqualify for cause.  He asserts that if trial counsel had not made such an agreement, a single defense-minded juror likely would not have voted for the death penalty.

In his reply to the State's motion for summary judgment filed in the district court, Gates acknowledged that there is no evidence in the form of testimony from prosecutors or defense attorneys regarding the reasons for their agreement to exclude prospective jurors without any voir dire examination.  Nevertheless, he maintains that they were excluded on the basis of their questionnaires alone and that some of those excluded without questioning were in fact qualified to serve.  He claimed that if the TCCA had permitted him to proceed with his state writ application, he would have elicited testimony from the trial lawyers about their reasons for agreeing to exclude all prospective jurors who indicated more than a neutral attitude toward capital punishment on their questionnaires.

The State points out that Gates cites nothing in the record to support his allegations but, even if the Court assumes that Gates's description of the agreement is accurate, Gates has not offered any evidence of whether defense counsel had strategic reasons for any presumed agreement and does not show

that counsel acted unwisely in making such an agreement.  The State suggests that trial counsel may have reviewed the questionnaires and wished to get deeper into the panel, or they may have valued the preservation of their own peremptory strikes rather than using them on prosecution-friendly panel members.  The State contends that Gates merely speculates as to prejudice, and offers nothing to suggest that any prospective juror removed by agreement would have made it onto the jury and would have voted in a manner favorable to him.

The district court denied relief on the ground that Gates did not establish the absence of a reasonable strategic or tactical basis for counsel to enter into the alleged agreement.  The court stated that Gates's briefing provided inadequate discussion about what jurors trial counsel allegedly dismissed, why they were dismissed, and whether an agreement existed concerning their dismissal.  It stated that even if trial counsel agreed to remove all prospective jurors unequivocally opposed to or in favor of a death sentence, such an approach falls within an area reserved traditionally for strategic decision making.

Reasonable jurists would not debate the district court's decision.  The record reflects that questionnaires were given to prospective jurors and that the prosecution and defense each had copies.  However, the questionnaires are not part of the record.  The record indicates that 178 prospective jurors were excused by agreement, but does not indicate the basis for the agreement.  The record also reflects that the prosecution and defense agreed to excuse certain prospective jurors in exchange for the other side's agreement to excuse other prospective jurors.  However, the record contains nothing to substantiate Gates's assertion that the agreements were based solely on opposition to or support for the death penalty.  The record also reflects that some prospective

jurors who indicated that they would always impose the death penalty, and some who indicated that they could never answer the questions in a way that would result in imposition of the death penalty, were questioned individually. The record reflects that other prospective jurors were excused by agreement based on medical conditions of themselves or family members, or problems with travel or employment. Although Gates complains that he should have had an evidentiary hearing in which to question trial counsel and the prosecution about their reasons for the alleged agreement, he does not explain how he could establish prejudice at such a hearing. We therefore DENY his request for a COA for this claim.

### 2. Threat to Cellmate

Gates requests a COA for his claims that trial counsel were ineffective at sentencing because they failed to object to Michael Camero's testimony on hearsay and Confrontation Clause grounds (Claims 3 and 4).

The State called Camero, who shared a cell with Gates in the Harris County Jail, as a witness at the punishment phase. Prior to Camero's testimony, Gates's counsel asked for a proffer from the State that Camero was not going to testify to hearsay. The prosecutor proffered a summary of Camero's anticipated testimony. The trial judge ruled that he would not allow hearsay testimony.

Camero testified that he and Gates got along well initially, but later Gates began threatening him, saying, "I'll wait until you go to sleep." Camero interpreted that statement to mean that Gates could strangle him or "get" him when he was asleep.

The prosecutor attempted to elicit evidence that Michael Bonhem, a friend of Camero's who did not testify at trial, heard Gates make additional threats directed to Camero, outside of Camero's presence:

18

Q. I want to ask you a question. I just want you to answer it "yes" or "no." In addition to the things you actually heard [Gates] say, did you speak with any friends who were in this cell about what was going on while you were sleeping? If you could just say "yes" or "no."

A. Can you run that again?

Q. In addition to things that you yourself heard from [Gates's] own mouth, did you speak with one of your friends in the cell about what was going on while you were sleeping?

A. Yes.

Q. And what was that friend's name?

A. I brought it to the attention of several people downstairs—

[Defense counsel]: Objection, this is nonresponsive. Secondly, we object to that line of questioning being irrelevant. All it's going to do is call for a hearsay answer.

THE COURT: That's overruled at this time.

Q. … What was the name of your friend in your cell block that you spoke with about what was going on while you were sleeping?

[Defense counsel]: Object to that. First of all, it assumes facts not in evidence of anything that was going on when he was sleeping.

THE COURT: That's overruled.

You may answer the name of the person.

A. Michael Bonhem.

Q. … And were you and he good friends in your cell?

A. Yes. May I state that he was in B Cell—

[Defense counsel]: Objection, nonresponsive.

THE COURT: Sustained.

Q. . . . Was he someone you were friendly with up there where you were housed in the jail?

A. Yes, sir.

19

No. 15-70024

Q. And was he someone who could see you while you were sleeping?

A. Yes.

Q. After you heard these things and after you spoke with your friend, did you decide to do anything concerning your safety?

A. Yes.

Q. What did you decide to do?

A. I think I put an I-60 out.

Q. What does that mean?

A. Requests for if you have a problem in your cell or tank or stuff or you got a medical problem, anything, any problem that you have you can write on there and the deputy looks at it and –

Q. What were you concerned about when [you] wrote up that I-60 request?

A. Not waking up.

Q. Meaning what?

A. Him getting me one night, or something, in the cell.

Q. And when you say "him getting you," who do you mean?

A. Bill Gates.

Q. Were you two separated at that point?

A. When I filled that I-60 out?

Q. Uh-huh.

A. Right away they came in and had him moved.

Q. Who was moved out of the cell, you or the defendant?

A. Bill Gates.

Camero testified that about a week before trial he ran into Gates in the jail law library and Gates knew he had been subpoenaed to testify. Camero said that Gates "just kept saying, 'How can you do this? Don't testify.' You know, just saying he don't want me to testify against him." Camero said that he was scared and wanted to get out of the library as fast as possible. Camero

also testified that when he was brought to the courthouse to testify, Gates saw him and "hollered" at him, but he did not recall Gates's exact words.

On cross-examination, Camero testified that he was housed with Gates about two months and was on friendly terms with Gates, who helped him learn how to survive in jail. On redirect, the prosecutor again tried to elicit evidence that Gates had made other threats against Camero out of Camero's presence:

> Q. Michael, listen to my question if you could, please. Was there more that went on in the cell—if you could just say "yes" or "no." Was there more that went on that had you concerned than [Gates] just saying, "Wait until you go to sleep?"
>
> A. Yes.
>
> Q. Were those some of the things that you spoke about with your friend that he—
>
> [Defense counsel]: I object to that. That is putting hearsay into evidence, Your Honor.
>
> THE COURT: Overruled.
>
> Q. . . . Follow my question?
>
> A. Yes.
>
> Q. Is part of your decision that you asked to get out of your cell what your friend—
>
> [Defense counsel]: We object to that as being a leading question.
>
> THE COURT: Overruled for this purpose.
>
> Q. . . . Follow what I just said?
>
> A. (Nods head affirmatively.)
>
> Q. You can answer.
>
> A. Yes.
>
> Q. In other words, part of your reason for asking to get off was what your friend told you was going on?
>
> [Defense counsel]: Objection, that's leading.

21

No. 15-70024

Q. . . . Why not just tell us what your friend told you while you were sleeping?

[Defense counsel]: Judge, that's hearsay. We object to that.

THE COURT: You-all approach the bench please.

The following colloquy occurred at the bench:

[Defense counsel]: Okay. Let's don't breakdown here at the end.

[Prosecutor]: It's not fair they object to him leading if I am trying to keep out the hearsay.

THE COURT: The bottom line is, it seems like there ought to be a way to frame that question so it can deal with answering what topic was brought up on cross and not leave something that is contrary to your position, that I am sure you would think is a false impression with the jury.

So based on the—your experience and age, I know you will be able to come up with a question that will be able to walk that thin line. So I will sustain the objection to the question as asked; but basically, I do believe you are entitled to go into his state of mind and to show that if it is true he had other things that caused him—

[Defense counsel]: I don't mind him saying he had other reasons that he wanted to be moved. I just don't want him saying what they were because those were hearsay.

[Prosecutor]: Right. He's not saying. He's just trying to answer "yes" or "no," but you object.

[Defense counsel]: If you asked a man in jail other reasons why you want to leave other than the threat made by Gates, and he said yeah, I can object to that.

[Prosecutor]: But there were threats by Gates.

[Defense counsel]: I said "other than."

[Prosecutor]: Okay.

After the bench conference, the prosecutor continued:

22

Q.  Michael, I think the jury can follow what I am trying to get at.  I'll just ask you a couple specific questions.  Just answer "yes" or "no," if you could, please.

I believe [defense counsel] asked you a question that said something to the effect that the only threat made by the defendant was, "Wait until you get to sleep."  Remember that—

A.  Yes.

Q.  –question asked of you?

A.  Yes.

Q.  Were there other things that [Gates] was doing that had you concerned besides just that comment?

A.  Yes.

Q.  Is that what you were speaking with your friend about?

A.  Yes.

Gates claims that trial counsel's abandonment of the hearsay objection allowed the State to introduce "backdoor hearsay,"—testimony that, while omitting the recitation of the out-of-court statement, permitted the jurors to infer the substance of the statement.  He asserts that by failing to persist in the hearsay objections until he had obtained an adverse ruling from the trial judge, trial counsel not only permitted damaging, objectionable testimony to come before the jury, but also abandoned Gates's right to have the error corrected on direct appeal and denied Gates his right to be confronted by the witness (Michael Bonhem) whose implicit testimony was being offered against him.

The district court denied relief on the grounds that trial counsel had strongly objected to the testimony and Gates could not demonstrate prejudice because he had not shown that additional efforts were necessary or that they would have been successful.  Reasonable jurists would not debate the district court's conclusion that Gates cannot show a reasonable probability of a

23

different result at sentencing had his counsel objected on Confrontation Clause grounds, or continued to object on hearsay grounds.  Gates also has not shown that additional factual development or an evidentiary hearing would strengthen his argument that he was prejudiced.  We therefore DENY a COA for this claim.

### 3.  Testimony about 1996 Arrest

Finally, Gates requests a COA for his claim that trial counsel were ineffective by not objecting, at sentencing, to testimony about his 1996 arrest and convictions for deadly conduct and misdemeanor assault (Claim 5).  The evidence at issue was testimony that in the early morning hours of April 11, 1996, police officers were called to a house in northeast Houston.  They found a woman standing in the street in front of a house.  She looked like she had been assaulted.  She told the officers that she was Gates's common-law wife.  Another officer described her as Gates's ex-girlfriend or ex-common-law wife.  The officers ascertained that Gates and the woman either leased or owned the house.  The officers decided that they were going to arrest Gates for domestic violence.  The woman signed a consent form giving the officers permission to enter the house.

Gates was locked inside the house.  A patrol sergeant knocked on the front door and Gates cursed him and told him to go away.  The sergeant directed other officers to create a diversion at the back door, so that he could force his way in through the front door. When he did so, Gates confronted him with a knife in each hand.  The sergeant ordered Gates to drop the knives, but Gates began coming toward the sergeant with the knives up.  The sergeant raised his gun and was about to shoot Gates when another officer came between them.  The sergeant used his taser and dropped Gates, who continued to struggle and fight with the officers.  It took several officers to force Gates

into a patrol car for transport to the jail.  Gates was convicted of assault and deadly conduct based on his resistance.

Gates alleges that the police "admitted" that he was the principal resident of the house and, because he was the principal resident, the woman who gave the police permission to enter the house did not have shared authority to allow entry.  He thus contends that the police entry was wrongful and he was justified in resisting arrest.  He alleges that if trial counsel had objected properly, the evidence of his resistance to the officers' entry and the convictions arising from that resistance could have been excluded.

Gates argues that he demonstrated prejudice because the court cannot have confidence that the jury would have found future dangerousness beyond a reasonable doubt had the evidence been excluded.  He reasons that this is so because, except for his long criminal history in California as a young man, there were relatively few instances of unlawful violence committed by him as an older man after he moved to Houston.  He asserts that, other than the evidence of this 1996 arrest, and the alleged stabbing of a man for which he was never charged or prosecuted, the only other evidence offered by the State to establish his propensity for future violence (apart from the capital murder) was the alleged threat to Camero.  He asserts that had trial counsel succeeded in excluding that evidence, as they attempted to do, or had they objected to the unlawful entry of police officers into his home in 1996, as they should have done, the stabbing for which he was never prosecuted would have been the only extraneous violent act apparently committed by him in 13 years, and that act was supported only by the testimony of the injured party, who was of uncertain reliability because he was unwilling to press charges at the time.  Gates argues that, with the evidence in such a condition, the prosecution's claim that he was

likely to be a continuing threat if not executed would have been significantly less persuasive.

The district court denied relief on the ground that the testimony established that the police officers had a reasonable belief that the woman standing outside the house was Gates's common-law wife and had joint authority to consent. Thus, an objection would have been futile, and Gates cannot demonstrate prejudice.

Gates does not cite any record support for his claim that the police officers admitted that he was the principal resident of the house. Reasonable jurists would not debate the district court's conclusion that the testimony shows that the officers reasonably believed that the woman had joint authority to consent. In any event, even if it is assumed that a proper objection would have been successful, Gates has not shown a reasonable probability that his sentence would have been different if the evidence had been excluded. Gates makes no showing that additional factual development would strengthen his arguments, and does not suggest how he might provide more persuasive proof of this claim at an evidentiary hearing. Accordingly, we DENY a COA for this claim.

## III.

To sum up, we GRANT a COA for Claim 1, and DENY a COA for the remaining claims.

COA GRANTED in part and DENIED in part.