# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-70024

United States Court of Appeals
Fifth Circuit

**FILED**
August 24, 2016

Lyle W. Cayce
Clerk

BILL DOUGLAS GATES,

      Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

      Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-2702

Before JOLLY, CLEMENT, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Bill Douglas Gates was convicted of capital murder and sentenced to death in Texas. Based on our "threshold inquiry," consisting of "an overview of the claims in the habeas petition and a general assessment of their merits," *Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003), this Court granted a certificate of appealability (COA) authorizing Gates to appeal the district court's denial of federal habeas relief as to his claim regarding investigation

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-70024

and presentation of mitigating evidence. We authorized Gates to file a supplemental brief addressing the merits of this claim, to the extent not already addressed in the COA briefing, but he declined. We now AFFIRM the district court's denial of federal habeas relief for this claim, for the reasons that follow.

I.

The facts and procedural history are set out in our opinion of May 18, 2016. *Gates v. Davis*, ___ F. App'x ___, 2016 WL 2909193, at *1–4 (5th Cir. May 18, 2016).

A.

Gates claims that trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence at the punishment phase of his trial. This claim was not raised by Gates's state habeas counsel and is procedurally defaulted. Under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), federal habeas petitioners may attempt to show cause for default by demonstrating the ineffectiveness of state habeas counsel in failing to raise a substantial ineffective assistance of trial counsel claim. 132 S. Ct. 1309, 1316 (2013). The Court in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), applied *Martinez* to Texas inmates. A finding that *Martinez* applies allows federal district court merits review of claims that are otherwise procedurally defaulted. *See Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014). While the district court found Gates's claim procedurally defaulted, it also addressed Gates's claim on the merits and concluded that he was not entitled to federal habeas relief. Because Gates has already received the relief available to him under *Martinez* and *Trevino*—that is, review of the merits by the district court—we turn directly to the merits of Gates's IATC claim.

2

No. 15-70024

To establish ineffective assistance of trial counsel, a petitioner must show that counsel's performance was deficient and that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). This showing is intentionally difficult to make: "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome. . . . Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* at 111.

B.

The defense did not present any evidence at the punishment phase of Gates's trial.  Prior to closing arguments, Gates's counsel stated to the trial court that they had made a diligent effort to contact a couple of cousins, but had been unable to locate them.

The prosecution relied on the lack of witnesses for Gates to urge the jury, in closing argument, to ignore the mitigation special issue "because there isn't a shred of mitigating evidence."  The prosecutor stated further:  "In terms of mitigation, is there any evidence before you that the defendant is retarded, that he was abused as a child, some evidence that he was a warrior or did anything extraordinary in his life?  Absolutely no."

In their closing arguments, Gates's counsel referred to testimony of a jailer that Gates was a good worker and had been put in the job of staff worker in the jail, one of two, out of 700.  Defense counsel also pointed out that Gates would not be eligible for parole until old age, and would no longer pose a threat to society if released.  Counsel asked the jury to be compassionate to Gates, noting that no one had ever shown Gates any mercy or support, as evidenced

by the fact that no one had come to speak for Gates, plead for his life, or even to say, "Good-bye, Bill."

Gates argues that no witnesses were called to testify for him because his defense lawyers never tried to locate any or to make any investigation of his early life experiences. In his brief in support of his federal habeas petition, Gates alleged that effective counsel would have talked to his older brother, who would have described the conditions in which Gates was raised and which determined the dysfunctional course of his life, and would have found school records from California which regularly note the turbulence of his home life, variously describe him as belligerent, emotionally and socially immature, slow to learn, and having a short attention span, and corroborate the information provided by his brother. He alleged that if counsel had retained a mental health professional, they would have learned that Gates suffers cognitive and emotional disabilities, probably caused by his mother's alcohol abuse during her pregnancy with him, her dissipated lifestyle after he was born, and a level of neglect which left him at the mercy of a social order where he was regarded as a second-class citizen.

To support these allegations, Gates presented the following exhibits in support of his federal habeas petition: (1) the affidavit of mitigation specialist Vince Gonzales, along with California court records and school records; (2) the affidavit of his half-brother, George Lemmons, Jr.; (3) the affidavit of his half-sister, Tommie Jean Riggs; (4) the affidavit of his aunt, Billie Swancy; and (5) the report of a neuropsychological evaluation conducted by Gilbert Martinez, Ph.D., who was retained by federal habeas counsel.

In his affidavit, Gonzales stated that he obtained school records describing Gates as emotionally and socially immature, a slow learner with a short attention span, and as having a home life in turmoil. Gonzales spoke

with an attorney and obtained paperwork suggesting at least two cases in which Gates's mental health was an issue. Gonzales's interviews with Tommie Jean Riggs (maternal half-sister), George Lemmons, Jr. (maternal half-brother), Vada Swancy Houston (cousin) and Billie Swancy (aunt) corroborated statements in Gates's school records describing a life of turmoil. All of them also described alcoholism being prevalent in the households in which Gates lived. Gonzales stated that Gates's aunt, Billie Swancy, had reported that Gates's mother, Nettie Scott, was a heavy drinker and that she was unaware of any period in Ms. Scott's life when Ms. Scott did not consume alcohol, including the time when she was pregnant with Gates.

Gates's half-brother, George Lemmons, stated in his affidavit that he is three years older than Gates. He stated that Gates's birth certificate reflects that he was a small baby, weighing only 5 pounds, 10 ounces and measuring 17 1/2 inches in length. Their mother, who died in 1958, when Gates was about 9 years old, was an alcoholic, and each of the households they lived in suffered under the burden of alcohol abuse. He said that Gates had a troubled childhood, was subjected to harsh discipline by his caretakers, and received less encouragement and positive reinforcement. He also stated that Gates was a "bothersome" child who would pick on other children and was a "pest." Further, from an early age, Gates had an explosive temper and would often get angry at the slightest event. He said that Gates had informed him, many years after leaving the California Youth Authority, that he had been sexually assaulted by a guard and later by older inmates. He described his correspondence with Gates that included references to prescription anti-depressant medication, children Gates may have fathered, Gates's attempts to obtain help for drug addiction and homelessness, and various documents showing completion of vocational and religious coursework while Gates was

incarcerated.  Lemmons said that Gates also reported that he had been beaten by a police officer and sustained a head injury.  He said that he had been told that their mother was taken to a "voodoo" doctor to cure hallucinations and mean-spirited behavior.

Gates's half-sister, Tommie Jean Riggs, stated in her affidavit that when she was three years old, she and her brothers were removed from their mother's care by Children's Protective Services.  She said it has always been her understanding that the removal was because of the mother's alcohol problem.  She was placed with her father and never lived with her brothers again.  She could only remember seeing Gates six or seven times.

Gates's aunt, Billie Swancy, stated in her affidavit that Gates's mother, Nettie Scott, was a "serious, heavy drinker" who drank all the time, including when she was pregnant.  Gates's mother was once taken to a "voodoo" doctor to cure her strange behavior and alcoholism.  Scott's drinking led to conflict and turmoil in her life and the lives of her children, who were moved from house to house and had no stability in their lives.

Dr. Gilbert Martinez, a psychologist, reported on his neuropsychological evaluation of Gates on August 11, 2009.  In addition to interviewing Gates and administering tests, Dr. Martinez also reviewed the mitigation report and affidavit of Vince Gonzales and the school records that Gonzales obtained.

Gates reported to Dr. Martinez that he had suffered several head injuries that resulted in a loss of consciousness, but said that he did not receive medical attention for the injuries because he had a fear of hospitals and suffered from hysteria.  Gates told Dr. Martinez that he suffered memory problems throughout his life, which Gates attributed to the head injuries.  Gates also told Dr. Martinez that he suffered from depression.  Dr. Martinez stated that Gates was somewhat evasive when discussing his childhood and family.

6

Although Gates said that, as a child, he was beaten regularly by adults, Gates did not believe it was physical abuse. Gates initially denied having other history of physical or sexual abuse but when asked specifically about a potential childhood sexual abuse history, Gates said that "growing up a few things happened, sometimes you have a sexual relationship." Gates told Dr. Martinez that he began smoking marijuana at age 11, smoked daily for many years, and was "high all day." He started smoking crack cocaine daily for many years and reported using hallucinogens several times. He also reported use of heroin, cocaine, and pills, including "Bennies" and Valium. He drank alcohol heavily in his thirties but otherwise tended to drink off and on.

Dr. Martinez said that Gates was also somewhat evasive when describing his social history. Gates was unsure why he was not raised by his mother and did not know his father. He believed that a police officer had killed his mother. He reported having a sister and brother but was unwilling to talk about their relationship with him. He reported being "common-law married two to three times" but was not willing to elaborate on his marital history or to discuss his children.

Gates told Dr. Martinez he had graduated from high school in California and described himself as a poor student after he was hit on the head at age seven. Gates suggested that he received poor care and education because there was a racial issue. He said that he was in special education classes throughout school, but provided no detail. He said that he had worked as a welder, short order cook, gas station manager, and boilermaker.

Dr. Martinez summarized his findings as follows:

With respect to emotional functioning, records reveal a pattern of affective and behavioral instability throughout Mr. Gates['] development. In addition to significant problems with behavioral dyscontrol, Mr. Gates appears to have developed a substance abuse

disorder beginning in early adolescence that was co-morbid with his emotional, behavioral, and cognitive deficiencies. He currently presents with thought and behavior suggesting he suffers from anxious preoccupation and significant problems with suspiciousness and mild paranoid-delusional ideation. This has likely been a lifelong problem for Mr. Gates and has been exacerbated by current severe psychosocial stressors. The extent to which his paranoid thought and behavior represent a psychotic disorder versus a characterological issue could not be fully determined [in] the current assessment, although his current clinical presentation and history are suggestive of a chronic mental disorder.

*Potential* etiologies to explain Mr. Gates' apparent lifelong problems with behavioral control and acquisition should primarily include the *strong probability* that he suffers from a Fetal Alcohol Syndrome Spectrum Disorder. Interviews with family members described a pattern of alcohol abuse during gestation that correlates with his behavioral and executive dysfunction throughout his development. Chronic substance abuse can also contribute to cognitive dysfunction, although Mr. Gates['] problems with learning and behavior appear to be preceded by his substance abuse. It is likely that poor impulse control, impaired judgment, and behavioral instability throughout his development contributed to his substance abuse disorder.

Mr. Gates also described a potential history of repetitive head trauma and subsequent speech deficits which may be contributing to his cognitive, emotional, and behavioral problems as well. Unfortunately, documentation appears to be limited in describing the extent and severity of these injuries, and his behavioral problems appeared to have started at a very [early] age.

ROA.150–51 (emphasis added).

Dr. Martinez concluded that Gates "appears to suffer from lifelong problems with behavioral dyscontrol, emotional dysfunction, and reduced learning and acquisition that can be correlated with information in his mitigation history *suggesting* that his mother abused alcohol during gestation and his infancy." ROA.151 (emphasis added). He concluded further that Gates

"suffers from suspiciousness and paranoid ideation that may be related to a potential undiagnosed/untreated chronic mental disorder." However, he found that, because of the nature of such condition, Gates was likely to be unwilling to accept medical treatment for it.

Gates contends that, based on the exhibits he offered in support of his federal habeas petition, an unobjectionable argument could have been made to the jury that he was conceived, born, and delivered into the world by an alcoholic mother, whose consumption of alcohol during her pregnancy probably resulted in some degree of fetal alcohol brain damage and ensuing spectrum disorders, largely corroborated by very low IQ scores and poor academic performance, that he was neglected and abused by family members and by a series of men with whom his mother had fleeting, unsuccessful relationships, and that he was raised in poverty, had trouble in school from an early age, was embittered by mistreatment from law enforcement officers, suffered sexual assaults in prison while still a teenager, and never succeeded at any vocation or career.

With respect to prejudice, Gates asserts that the evidence of the circumstances of his birth and upbringing, all beyond his control, would likely have made a difference at the punishment phase, because it explains and places in context the conduct that the prosecution relied on for a death sentence, and rebuts the inference that his violent and antisocial behavior was something entirely of his own making and for which he alone should be held responsible.

Gates also contends that the district court should not have denied this claim without allowing funds for further factual development and conducting an evidentiary hearing. He claims that trial counsel refused to provide affidavits explaining what strategic or tactical reasons they might have had

for their action or inaction and that, without an opportunity to compel their testimony through the use of compulsory process, he cannot now meet his burden to establish that the shortcomings alleged in his petition were caused by deficient performance and were not the product of deliberate strategic or tactical judgments.

The State points out that because Gates never presented this claim in state court, trial counsel never had the opportunity to respond to his allegations. Therefore, the court must presume that trial counsel made a strategic decision to base their defense at punishment on Gates's lack of support from family and friends and the State's failure to prove future dangerousness.

The State also attacks the evidence presented by Gates. It notes that although Lemmons, Gates's half-brother, said that he was never contacted by trial counsel, Lemmons acknowledges that he was contacted by Gates. The State thus contends that one could reasonably infer that Gates did not tell trial counsel about Lemmons, or specifically told trial counsel not to contact Lemmons; or one could infer that counsel did contact Lemmons, and Lemmons declined to cooperate. The State observes that Gates's psychologist, Dr. Martinez, noted that Gates was evasive about his history and was unwilling to discuss his children or his relationships with his siblings. Based on Gates's counsel's statement in closing argument that "not a soul came here to speak on behalf of Bill Gates," the State asserts that it could be inferred that those family members contacted by counsel declined to appear. Finally, the State asserts that Gates's allegations of fetal alcohol syndrome are unsubstantiated, and he offers only hearsay and unsubstantiated statements regarding a poor upbringing, childhood neglect, and sexual assault. Moreover, some of the evidence, such as long-term drug use, mental difficulties, and an explosive

10

temper, might have been viewed by the jury as aggravating. The State concludes that, considering the evidence of Gates's life-long violent criminal activity, which culminated in the rape and strangulation of the victim, Gates failed to demonstrate a reasonable probability that the jury would have reached a different decision on punishment.

The district court observed that there were evidentiary problems with some of Gates's allegations. For example, Gates told his half-brother, Lemmons, that he had been sexually assaulted, but he did not verify that information with his own affidavit or any other reliable account. Nor did he substantiate the hearsay statements contained in his federal habeas investigator's affidavit. The court noted that although it had authorized funds for an expert whose evaluation raised the possibility[1] that Gates suffered from fetal alcohol syndrome, the expert, Dr. Martinez, did not diagnose him with that condition after evaluating him. The district court also noted that some of Gates's new evidence would not be beneficial to the defense: (1) although evidence of fetal alcohol syndrome-related deficiencies might support an inference that Gates was not morally culpable for his behavior, it also might suggest that he, as a product of his environment, was likely to continue to be dangerous in the future; (2) evidence that Gates was belligerent, emotionally and socially immature, slow to learn, and had a short attention span, would not necessarily encourage a jury to forgo a death sentence; and (3) the evidence of Gates's explosive temper and resistance to authority would have a sharp aggravating edge.

The district court acknowledged that elements of Gates's troubled background might have given jurors a sympathetic understanding of his early

---

[1] Actually, Dr. Martinez reported that there was a "strong probability" that Gates suffers from a Fetal Alcohol Syndrome Spectrum Disorder.

involvement in crime, but pointed out that Gates was 37 years old when tried for capital murder.[2]  The court concluded that, with the subsequent years of unremitting violence, the evidence relating to Gates's family—their substance abuse, mental illness and criminal problems—was by no means clearly mitigating, as the jury might have concluded that Gates was simply beyond rehabilitation.  The court stated that, to the extent that Gates claimed that trial counsel should have argued that he received virtually no guidance as a youth and lacked sufficient resources to support his efforts to seek treatment for his conditions, that information bears similar mitigating thrust to trial counsel's argument that no one had ever shown Gates any mercy or support.

After weighing the new evidence Gates presented in federal court against the evidence presented by the prosecution at trial—three serious adult felonies in California, aggravated assault on a peace officer, aggravated robbery, possession of a sharp instrument in prison, and the fact that Gates had already received two life sentences before his rape and strangulation of the victim—the district court held that Gates had failed to demonstrate a reasonable probability of a different result had the unpresented mitigating evidence been presented.

The court concluded:

> Gates provides information trial counsel probably did not have and certainly did not put before jurors, but makes only summary arguments that the unpresented information would have allowed the jurors to return answers to the special issues resulting in a life sentence.  This Court's own review of the new evidence, when placed into the landscape of that which jurors considered, does not show a reasonable probability of a different result.  On that ground, Gates has not shown actual prejudice from state habeas counsel's failure to raise the barred *Strickland* claim.

---

[2] Gates was born in 1949, so he was 51 years old when tried for capital murder and, at that time, had a 37-year career of crime, which began when he was 13 years old.

Gates's mitigation-evidence claim is procedurally barred. Alternatively, and for the same reasons, Gates has not met his burden of showing that he deserves federal habeas relief on the merits.

After de novo review of all of the evidence, we conclude that even if deficient performance is presumed, the district court did not reversibly err in its analysis of prejudice. As the district court noted, the new evidence of sexual assault that Gates submitted is unsubstantiated. He did not even submit his own affidavit about the alleged sexual assault.

Although the district court may have mischaracterized Dr. Martinez's findings when it said that his evaluation raised the "possibility that Gates suffered from fetal alcohol syndrome," it is true that Dr. Martinez did not definitively diagnose Gates with fetal alcohol syndrome. Nevertheless, Dr. Martinez did state that there was information in Gates's mitigation history "suggesting" that his mother abused alcohol while pregnant with him and found that there was a "strong probability" that Gates "suffers from a Fetal Alcohol Syndrome Spectrum Disorder."

As the district court observed, evidence of fetal alcohol syndrome-related deficiencies is mitigating in the sense that it might support an inference that Gates is not as morally culpable for his behavior, but it also is aggravating in the sense that it might support an inference that Gates is likely to continue to be dangerous in the future. *See Sells v. Stephens*, 536 F. App'x 483, 495 (5th Cir. 2013); *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012).

This Court's recent opinion in *Trevino v. Davis*, ___ F.3d ___, 2016 WL 3710083 (5th Cir. July 11, 2016), which discussed fetal alcohol spectrum disorder (FASD) at length, does not support a different conclusion. Although the issue before the Court in *Trevino* was whether a COA should be granted, the Court stated that reasonable jurists would not only agree that the district

13

court's decision was debatable, but would also agree that the district court erred by dismissing Trevino's FASD claim, thus indicating that Trevino should prevail on the merits. *Id.* at \*22. Nevertheless, *Trevino* does not support a ruling on the merits for Gates, because there is not a reasonable probability that Gates's jury would have reached a different decision, considering the mitigating evidence he offered, including the evidence of FASD, and the aggravating evidence.

The report of Trevino's expert, Dr. Dyer, indicated that she had received information from one of Trevino's federal habeas lawyers that, based on reviews of his school records and interviews with his mother and family members, there was evidence suggesting that Trevino had a history of fetal alcohol syndrome (FAS) and possible cognitive limitations as a result of prenatal exposure to alcohol. *Id.* at \*19. Trevino's expert reported that Trevino's facial features included notable distinguishing eye characteristics, his stature is slightly below the norm for his age and ethnic group, and his prenatal exposure to alcohol was significant, as was his low birth weight. *Id.* at \*20. Trevino's expert was able to obtain information about Trevino's prenatal alcohol exposure from a face-to-face interview of Trevino's mother. *Id.* at \*19. Here, Gates's expert, Dr. Martinez, was unable to interview Gates's mother, because she died in 1958. Dr. Martinez apparently relied on Gonzales's affidavit which stated that Gates's aunt had reported that Gates's mother was a heavy drinker and consumed alcohol while she was pregnant with Gates.

Trevino's expert's report described in detail the characteristics and effects of FAS and Fetal Alcohol Effects (FAE),[3] and explained how FAE would

---

[3] According to Trevino's expert's report, FAS "is diagnosed when there is apparent facial    dysmorphology,    growth    restriction,    and    central    nervous    system    and

have affected Trevino's decisions to participate in or refrain from the activities that resulted in his capital murder charges and his ability to understand and respond appropriately to the plea offer presented to him by his counsel. *Id.* at *19-20. The report of Gates's expert does not contain similar information. We also observe that Trevino's expert's opinion that Trevino "presents with the characteristics of FAE" was more definitive than Gates's expert's opinion that there was a "strong probability" that Gates suffers from FASD, perhaps because Trevino's expert had more information, including an interview with Trevino's mother, upon which to base her opinion.

*Trevino* is distinguishable on other grounds as well. First, the district court's prior opinion in *Trevino* had strongly suggested that the FASD evidence in that case, if properly developed and admitted, conceivably could have changed the result. *Id.* at *21. Second, the possible FASD evidence in *Trevino* went to the heart of the most aggravating evidence against Trevino, his inability to express remorse.

In the light of the overwhelming evidence of Gates's long history of violent criminal behavior presented at trial, we hold that the district court did not err by concluding that Gates has not demonstrated a reasonable probability that presentation of the new evidence developed by his federal habeas counsel would have produced a different result at sentencing. Accordingly, he cannot establish that he was prejudiced.

Gates also has not shown any abuse of discretion in the district court's refusal to allow further factual development or an evidentiary hearing on this claim. The factual development that Gates claims that the district court

---

neurodevelopmental abnormalities, with or without confirmed prenatal exposure to alcohol." *Id.* at *19. FAE is a term used to describe individuals who were exposed to alcohol prenatally and have some, but not all of the characteristics of FAS. *Id.*

No. 15-70024

should have allowed (compelling the testimony of trial counsel to prove that the shortcomings alleged in his petition were not the product of deliberate strategic or tactical judgments) is relevant to the deficient performance prong of *Strickland.* The district court stated that the record provided only "hints" about trial counsel's efforts to prepare for the punishment phase and that, despite "significant funds" and time to investigate during the initial federal habeas proceedings, the record provided little insight into whether trial counsel performed deficiently in investigating mitigating evidence.[4] The district court's denial of relief, however, was based on the prejudice prong, and its conclusion that Gates had failed to address the impact his new evidence would have had at trial. Gates has not explained how further factual development or an evidentiary hearing would result in a stronger case for prejudice.

We hold that the district court did not err by denying relief because Gates has not demonstrated a reasonable probability that he would not have received a death sentence had counsel presented the evidence that federal habeas counsel developed and submitted in support of this claim. We also hold that the district court did not abuse its discretion by not allowing additional factual development or an evidentiary hearing.

II.

For the foregoing reasons, we AFFIRM the district court's denial of federal habeas relief.

---

[4] Our review of the record confirms the district court's assessment that there are only "hints" about the efforts that trial counsel made to investigate mitigating evidence. The state court record reflects that on September 25, 2000, the state court granted trial counsel's motion for funds to hire an investigator. During jury selection, defense counsel stated that he had received some addresses and phone numbers of potential witnesses.